UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Sophia Madigan,                          File No. 24-cv-1416 (ECT/EMB)

        Plaintiff,

v.                                       **OPINION AND ORDER**

Graco Inc.,

        Defendant.

---

Charlie R. Alden, Gilbert Alden Barbosa PLLC, Burnsville, MN, for Plaintiff Sophia Madigan.

Grant Daniel Goerke and Stephanie D. Sarantopoulos, Littler Mendelson, P.C., Minneapolis, MN, for Defendant Graco Inc.

---

Plaintiff Sophia Madigan claims her former employer, Defendant Graco Inc., discriminated against her based on her pregnancy. She asserts claims under federal and Minnesota law. Graco seeks summary judgment, and the motion will be granted. The record cannot reasonably be construed to support Ms. Madigan's discrimination theories.

I[1]

*Ms. Madigan worked for Graco as a machinist.* Ms. Madigan began her Graco employment in September or October of 2018. Madigan Tr. [ECF No. 25-1 at 18–74] 21:24–22:6. Graco hired her originally as an intern in its Minneapolis or "Riverside"

---

[1] Unless otherwise noted, the following facts are undisputed or described in a light most favorable to Ms. Madigan. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

manufacturing facility. *Id.* 22:13–23:1, 27:7–25. In May 2019, Ms. Madigan transitioned from intern to full-time Graco machinist, working on machines with computer numerical control—CNC, for short—and at some point in 2022 she advanced from a level C machinist to a level B machinist. *Id.* 23:14–24:25. As a level B machinist, Ms. Madigan worked on maintaining machines, "making parts, moving metal and loading machines with different metals," "making adjustments to programs and adjustments to measuring tools," entering information into machines, cleaning parts, inspecting parts, and packing parts in totes or boxes so they could be transported to the next step in the manufacturing process. *Id.* 25:9–26:6; *see* ECF No. 25-1 at 76 (Graco's posted job description for CNC Machinist B); Madigan Tr. 28:19–30:11 (testifying to accuracy of official job description). At some point after 2021, Ms. Madigan worked three 12-hour shifts on Friday, Saturday, and Sunday. Madigan Tr. 45:17–46:17. On top of those 36 hours, Graco provided a "four-hour fill"—in essence counting Ms. Madigan's time as a full 40-hour work week. *Id.* 47:8–15. She did not work other days unless she filled in for a coworker, attended training, or was asked to come in. *Id.* 48:23–50:8. On those rare occasions, Ms. Madigan worked 8-hour shifts. *Id.* 48:23–49:8.

 *The job exposed Ms. Madigan to certain chemicals and loud noises and required her to lift heavy objects.* Ms. Madigan was exposed to materials with lead and unspecified but dangerous chemicals in cutting oils. Madigan Tr. 34:11–35:20, 37:8–38:12. She wore an N-95 mask to avoid breathing particles from the metal, and gloves to protect her fingers. *Id.* 35:24–37:7. The production floor was very loud. Ms. Madigan always wore hearing protection, sometimes just earplugs, and sometimes noise-cancelling headphones over

earplugs.  *Id.* 32:5–14.  Initially, Ms. Madigan worked at a machining area categorized as a "high-level noise area," and she was required to have annual hearing tests because of the "dangerous" noise level.  *Id.* 33:2–15.  In 2021, she moved to a second machining area, still at the Riverside facility; while working there, she was not required to take hearing tests but continued to wear hearing protection.  *Id.* 33:21–34:10.  She also was required to lift objects of 45 pounds or more, sometimes "up to 60, 70 pounds."  *Id.* 40:15–21; *see* ECF No. 25-1 at 77.  Lifting heavy objects was necessary to load metal bars into the machine, Madigan Tr. 41:8–12, though Ms. Madigan did not have to do this task every day, *id.* 42:5–19.  At times coworkers would help each other lift the bars into the machines, but most of the time Ms. Madigan had to lift them by herself, either by hand or by crane.  *Id.* 43:6–20.

*Ms. Madigan became pregnant and was concerned about her baby's health.*  Ms. Madigan learned she was pregnant in January 2023.  *Id.* 52:3–7.  She was concerned that her work environment would harm her baby's health.  One machine (a "parts washer") "had a big label on it that said it wasn't safe for pregnant or breastfeeding women to interact with."  *Id.* 38:18–23.  Ms. Madigan visited a University of Minnesota Women's Healthcare Specialists clinic to discuss pregnancy-related concerns about her work environment.  *Id.* 53:25–54:22.  She learned from the clinic "that fetal hearing development happens rather early on in the first trimester of pregnancy," and that she should avoid certain materials and chemicals if possible.  *Id.* 55:21–56:1.

*Ms. Madigan sought pregnancy-related accommodations.*  In late January 2023, Ms. Madigan spoke to Breanna Morries in Graco's Human Resources department about the pregnancy and "voiced concerns about some of the labels . . . around the workplace and

about noise." *Id.* 56:11–19, 57:2–6.  Ms. Morries told Ms. Madigan to speak with Ms. Madigan's immediate supervisor and to provide medical documentation.  *Id.* 57:11–58:1. That same day, Ms. Madigan informed her supervisor of the pregnancy, though she does not remember discussing health concerns or requesting accommodations in that conversation.  *Id.* 58:2–22.  On January 27, Ms. Madigan provided Graco with a doctor's letter from the University of Minnesota clinic; the letter read:

> Sophia will be requiring work accommodations throughout her pregnancy to protect her health and the health of her baby. Please ensure that Sophia will not be exposed to chemicals considered harmful to pregnancy, noises loud enough to require ear protection, or lifting objects over 15lbs.  If Sophia is able to do office/desk work in a quieter environment, this will be ideal.

ECF No. 25-2 at 2.  The letter identified the baby's due date as October 4, 2023.  *Id.*  On February 7, Ms. Madigan provided Graco with another doctor's note detailing the requested accommodations:

> Please ensure Sophia will not be exposed to **any** heavy metals. This includes <u>absolutely no exposure to lead</u>.  Additionally, Sophia should have <u>absolutely no exposure to chemicals considered harmful to pregnancy, no noises louder than 75 decibels for any amount of time, and no lifting of objects over 15lbs.</u>  These exposures have been found to increase risk of preterm labor, spontaneous abortion, small-for-gestational-age newborns, and babies born with congenital malformations.
>
> It would be idea[l] for Sophia is able to do [sic] office/desk work in a quieter environment, if possible.  Please make these accommodations to ensure Sophia and her baby are safe in the workplace.

ECF No. 25-2 at 6.

*Ms. Madigan and Graco believed Graco could not both accommodate her requests and allow her to remain in the machinist role.* Ms. Morries reviewed the February 7 doctor's note and emailed Eric Gall, Graco's Human Resources Manager, saying Graco would not be "able to accommodate for [sic] these restrictions in [Ms. Madigan's] current role or here in Riverside." ECF No. 25-2 at 5. Ms. Morries told Ms. Madigan the same thing. Madigan Tr. 73:13–74:2. Ms. Madigan also believed it would not be possible to perform her job as a machinist under her requested accommodations. *Id.* 61:12–15. As she testified,

> I was always exposed to noises that were loud enough to require hearing protection. From my very first day of working there as an intern until my very last day on the production floor I wore hearing protection the entire time except for [adjusting earbuds]. So I knew that that would prevent me from being able to do my job as a machinist. Also, it wouldn't be very realistic to be a machinist and not have to lift objects over 15 pounds. It would require a lot of support from coworkers . . . to accommodate that. And then the chemicals, I just knew that there were things around in the environment that just wouldn't be considered safe for pregnancy.

*Id.* 61:19–62:10; *see id.* 66:23–67:6 (agreeing that the noise restrictions "really kind of knocks out the machinist work as eligible work"). In her view, however, accommodation was possible "[b]ecause Graco is a large company with lots of different jobs that people do. And [she] knew that they would be able to find something that [she] could do that would not require lifting over 15 pounds or hearing protection or being exposed to chemicals in any way." *Id.* 61:1–11.

*Graco accommodated injured employees.* Ms. Madigan knew of other Graco employees who had weightlifting restrictions for injuries like a broken arm, and one

5

machinist had a medical restriction on chemical exposure because he had an allergic reaction to cutting oil. *Id.* 62:19–64:1. The individual with an allergic reaction was able to work on other machines without exposing himself to the cutting oil. *Id.* 64:13–22. The lifting restrictions were typically temporary and went away once the injury healed. *Id.* 65:2–8. She identified one machinist who, in summer 2020, received a lifting restriction because of an unspecified injury. *Id.* 204:5–206:1. Graco accommodated this machinist by assigning him to the calibration lab, where he continued to work 8-hour days Monday through Friday, but from 6:00 a.m. to 2:00 p.m., rather than his previous shift of 2:00 p.m. to 10:00 p.m. *Id.* 206:2–207:8. Ms. Madigan did not know of any Graco employees who had a noise restriction or restrictions to accommodate a pregnancy. *Id.* 51:9–16, 65:23–25.

*Graco provided Ms. Madigan with an alternative, temporary position in Anoka.* On February 8, Ms. Morries emailed Ms. Madigan explaining that Graco could provide a position for Ms. Madigan that accommodated all her medical restrictions. ECF No. 25-2 at 40. The position was in Graco's Anoka office, which is about a 40-minute drive from the Riverside facility in Minneapolis. *Id.*; *see* Madigan Tr. 86:22–87:2. In her new role, Ms. Madigan was assigned to reprogram meters in an office setting. ECF No. 25-2 at 40. Reprogramming the meters was not physically demanding; a worker had to "hook up a cable from [a] programmer to the circuit board and plug it in," and then press "enter" on the computer keyboard, which initiated a four-minute software update. Lorden Tr. [ECF No. 25-2 at 42–66] 13:19–14:7. The job was temporary; Ms. Madigan "would work until the product was . . . all updated." *Id.* 18:24–19:5. Ordinarily another employee would do

the reprogramming, but he didn't have time for that work in addition to his other responsibilities. Madigan Tr. 89:6–90:7; Lorden Tr. 13:17–18.

*The Anoka position accommodated Ms. Madigan's medical restrictions.* While Ms. Madigan reprogrammed meters, she was not exposed to any harmful chemicals. Madigan Tr. 83:18–24. She was not subjected to loud noises or required to lift objects over 15 pounds, with two exceptions. *Id.* 83:25–84:16, 84:24–85:22. First, Ms. Madigan was initially required to clock in at the Anoka production facility, which, like the Riverside production facility, was loud. *Id.* 84:1–19. Graco responded to this concern by providing a time clock in the quiet Anoka office where Ms. Madigan was reprogramming meters, and "[t]hat took care of that." *Id.* 84:7–23. Second, at times the meters came in boxes weighing more than 15 pounds. *Id.* 85:2–18. Ms. Madigan solved this problem by removing enough meters so that the box weighed less than 15 pounds, and she "was pretty careful to empty the boxes" so they would not exceed her lifting restriction. *Id.*

*Ms. Madigan requested to reprogram the meters in Minneapolis, but Graco required her to do that work in Anoka.* Anoka was farther away from Ms. Madigan's home than the Riverside facility. *See id.* 96:4–10. It took her 13 minutes to commute to Riverside and 40 minutes to commute to the Anoka facility. *Id.* 87:1–13, 216:3–8. She typically commuted to Riverside by bus, bicycle, or a ride from her husband, and more rarely she walked to work. *Id.* 216:9–17. But it was impossible or impractical to commute to Anoka by busing, cycling, or walking, so she had to rely on a ride from her husband, and that cost him significant time. *Id.* 216:18–217:20. Ms. Madigan knew that other employees had reprogrammed meters from their homes, and she asked supervisors whether Graco could

7

move the meters to Minneapolis so she could do the work there.  *Id.* 87:14–25, 94:8–23.

Graco denied the request and required her to continue to work at the Anoka office.  *Id.*

94:14–23, 95:7–22 ("They just told me that they weren't going to do it, and it wasn't going

to happen.").

*Ms. Madigan requested five 8-hour shifts, but Graco gave her three 8-hour shifts.*

On February 20, Ms. Madigan's doctor wrote a letter asking her employer to "[p]lease

allow Sophia to work 8 hour days to allow for adequate rest and regular eating."  ECF No.

29-3 at 1.  Mr. Gall informed Ms. Madigan that Graco interpreted that language to be a

request, not a mandate it was obligated to accommodate.  ECF No. 29-5 at 1; *see* Gall Tr.

[ECF No. 25-3 at 2–12] 15:20–16:5.  On February 22, Ms. Madigan submitted another

doctor's note with more imperative language.  It read:

> Due to Sophia Madigan's pregnancy related condition it is
> medically advisable that she **does not** work 12 hour shifts and
> only works 8 hour shifts.
>
> I recommend the following reasonable accommodations for the
> entire duration of her pregnancy to allow for adequate rest and
> regular eating: She should **not work** 12 hours shifts [sic] and
> should only work 8 hour shifts.

ECF No. 25-3 at 14.  The medical note did not mention the number of hours she could

work in a week or how many shifts she should work.  *Id.*; Madigan Tr. 100:2–8, 120:10–

18 (noting that Ms. Madigan "never had a medical letter recommending that [she] work

five days a week").  Graco allowed Ms. Madigan to work 8 hours per day.  *Id.* 119:6–11,

121:15–23.  Ms. Madigan asked to take five 8-hour shifts each week; Graco allowed her to

work three 8-hour shifts.  *Id.* 119:6–24.  Though it is conceivable Graco had reasons to

deny Ms. Madigan's request to work five 8-hour shifts—for example, there may not have been enough of the work she was doing to fill more than three 8-hour shifts—no record evidence shows that Graco gave Ms. Madigan a reason why it did not approve her request.

*The three-day 8-hour shift arrangement affected Ms. Madigan's benefits, and Graco informed her of that.* On February 21, having received notice of the 8-hour restriction, Graco calculated how Ms. Madigan's benefits would be affected by her 24-hour work weeks. Under the Family and Medical Leave Act ("FMLA"), she would use up 12 hours per week. ECF No. 29-7 at 4. Estimating 32 weeks until childbirth, and adding 40 hours already used, Graco estimated that Ms. Madigan would use 424 of her 480 hours of available FMLA leave before giving birth. *Id.* Graco's short-term disability benefits were also affected. Chris Winn, Graco's senior disability specialist, wrote in an internal email:

> Per the Graco policy we deduct partial hours the same as a full work shift. So we would be deducting 36 hours a week x 32 weeks = 1152 hours used out of 1040 available. This would mean that she would NOT be eligible for any paid [short-term disability] benefits for her delivery and recovery as she would exhaust her 26 weeks of [disability leave] prior to the actual delivery.

*Id.*; Winn Tr. [ECF No. 25-2 at 11–25] 8:1–3. That day and the next (February 21–22), Mr. Gall twice emailed Ms. Madigan explaining how her benefits would be affected by the accommodation to three 8-hour shifts. *See* ECF No. 29-5 at 1–2; ECF No. 25-3 at 17. As to FMLA leave, he wrote:

> If you were to transition to eight hour shifts, from your normal twelve hour shifts, you would exhaust FMLA at a rate of 12 hours per week. Based on an estimated delivery date of 32 weeks from now, that would be a total of 384 hours of FMLA, which does not include 40 hours which has already been used.

9

> That would leave you with a total of 56 hours at the time of delivery.

ECF No. 29-5 at 1. Under Graco's policy, employees could be entitled to pay from short-term disability benefits for the hours they used FMLA leave. *See* ECF No. 25-1 at 5–6. As to those benefits, he wrote:

> Per Graco policy, partial hours of disability are deducted the same as a full shift. To that end, your [short-term disability] would be deducted by 36 hours per week (even though you are only missing 12 hours of work), which also means that the 26 weeks of coverage (1040 hours) would be exhausted prior to your expected due date, leaving you unpaid for a portion of the latter stage of your pregnancy.

ECF No. 29-5 at 1. Ms. Madigan could cover or defray wage loss in two ways: short-term disability pay and paid time off. If she took short-term disability, she would receive her full wage for the 8 hours per day she worked, and 67% of her full wage for the 4 hours per day she was missing, plus another 67% of the 4-hour fill. *Id.* Paid time off benefits, on the other hand, were used "in 12 hour increments, which then cover[ed] the entirety of [her] shift." ECF No. 25-3 at 17. Mr. Gall explained, "On days in which you use [paid time off], you would not be paid any Short Term Disability, as the shift is fully covered by [paid time off]." *Id.* He clarified that she was expected to return to work twelve weeks after delivery, which could "be covered by Minnesota Parenting Leave Act," and would run concurrent with "two weeks of paid leave under the Graco Parental Leave Practice." *Id.*

*Starting in March 2023, a new Graco policy provided ten more weeks of paid pregnancy-related leave.* In a document dated March 2, 2023, Graco's benefits manager wrote that the company had adopted "a new **Pregnancy-Related Medical Leave** program

10

for all U.S. regular full time and part time employees who give birth to a child on or after March 1, 2023." ECF No. 29-8 at 1. The announcement explained,

> [t]his leave provides an increase to the length of leave under the disability program (short-term and salary continuation) to up to 10 weeks if additional leave is supported by the employee's physician. In addition to the two-week Parental Leave Practice . . . this would give birth-mothers up to 12 weeks of paid leave at 100% pay.

*Id.* The record does not contain additional information about this leave.[2]

*The Anoka work concluded, and Ms. Madigan began office work at Riverside.* In April 2023, "[t]he meters had all been reprogrammed," so Ms. Madigan had no more work to do at the Anoka facility. Madigan Tr. 120:22–121:1. Graco assigned her to office work at the Riverside facility in Minneapolis. *Id.* 121:24–122:8. Ms. Madigan did "various things, . . . mostly packing repair kits" in a "cubicle space." *Id.* 122:11–13. She worked there until October 2023, when she gave birth. *Id.* 122:14–16, 173:6–7. Ms. Madigan identified two ways in which the Riverside office work "may have" failed to comply with her restrictions. *Id.* 123:1–126:9. First, it was possible that the parts she worked with exposed her to chemicals she was supposed to avoid. *Id.* 123:2–124:3. When she raised this issue with her immediate supervisor, he told her to wear gloves, which she did "to minimize skin contact with these things." *Id.* 123:24–124:3, 124:16–25. She did not raise the issue to anyone else at Graco. *Id.* 125:1–4. Second, she was twice asked to lift boxes

---

[2]    Graco filed a document stating that the company only provided two weeks of paid maternity leave. *See* ECF No. 25-1 at 2 (policy effective October 3, 2022). Resolving this factual dispute in Ms. Madigan's favor, as required at this procedural stage, Graco's policy was to provide up to twelve weeks of paid maternity leave. *See Anderson*, 477 U.S. at 255.

that were "way over 15 pounds," and she relied other employees to help. *Id.* 124:3–126:1.

She did not appreciate her supervisor's suggestion to "take everything out of the boxes,"

because it was difficult to bend down and remove things from the boxes when she was

eight months pregnant. *Id.* It took "a day or two," but Graco "ended up fixing the issue."

*Id.* 125:25–126:9. During this stint at Riverside, Ms. Madigan was never exposed to noise

levels above her restriction, and she was never required to work longer than 8 hours. *Id.*

127:2–9.

*Graco continued to update Ms. Madigan about the accommodations' effects on her*

*benefits.* In a July 2023 letter, Graco informed Ms. Madigan that she was eligible and had

been approved for FMLA leave from February 24, 2023, to September 27, 2023. ECF No.

25-3 at 19. The letter told her that "[a]s of September 23, 2023, if you have not delivered

your child, you will have exhausted all of your FMLA benefits and will no longer have

federal job protection under the FMLA regulations." *Id.* The letter also explained that Ms.

Madigan's short-term disability leave was approved from February 24, 2023, to September

18, 2023. *Id.* Under the short-term disability leave policy, Ms. Madigan was eligible for

67% of her normal wage. *Id.* The letter explained that

> [a]ny time missed after your benefit exhaustion date . . . would
> need to be covered by vacation or personal time to bridge the
> gap until your actual delivery date. If you do not have enough
> time available the resulting time would default to personal time
> and could result in a termination of your employment.

*Id.* Graco officials met with Ms. Madigan to discuss the letter's contents and asked her to

sign the letter; she refused to sign the letter. *See id.*; Madigan Tr. 129:1–9. Ms. Madigan's

supervisor told her that she could "face disciplinary action" unless she signed it. Madigan

Tr. 133:14–22.   Ms. Madigan testified that the July meeting "was the first time it was explained to [her] that this FMLA leave was linked to the maternity leave, the policy that Graco has." *Id.* 131:1–4.

*Ms. Madigan filed a discrimination charge with the EEOC.*   On August 4, 2023, Ms. Madigan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   *Id.* 157:3–23.   The charge identified discrimination because of sex, pregnancy, and disability, and it also alleged retaliation.   ECF No. 25-3 at 22.   Ms. Madigan did not claim the discrimination was a "continuing action," *id.*, though she testified she should have, *see* Madigan Tr. 165:2–10.   The EEOC dismissed Ms. Madigan's charge, *see id.* 191:24–192:18, but the right-to-sue letter is not in the record.

*Graco again informed Ms. Madigan about the status of her benefits in September.* On September 28, Mr. Gall emailed Ms. Madigan about the timelines for her short-term disability and FMLA benefits.   ECF No. 25-4 at 2.   The former would be exhausted on October 1, and the latter exhausted on October 8.   *Id.*   "Starting 10/9 any time missed is NOT covered time off [under FMLA] and will be subject to Vacation and Personal time to bridge the gap until the delivery date."   *Id.*   Mr. Gall wrote,

> [a]fter delivery you will be placed on a personal leave of absence for 6-8 weeks (depending on the delivery method) and tracked under the MN Pregnancy and Parenting Leave law. This time off will be unpaid.   Since it is unpaid time off, benefits deductions will be placed into arrears and will be deducted when you return to work. . . .   After delivery, you are eligible for Graco's Parental Leave, which provides two weeks of paid leave.   Unless you instruct otherwise, we will commence the Parental Leave for the first two weeks after your

> delivery.  This leave is in addition to the personal leave of absence noted above.

*Id.*

*Ms. Madigan gave birth and took more leave.*  Ms. Madigan gave birth on October 8.  Madigan Tr. 173:7.  She took two weeks' paid leave after childbirth.  *Id.* 172:20–173:2.  After that she took an unpaid leave of absence.  *Id.* 173:22–174:14.  This leave was provided pursuant to the Minnesota Parenting Leave Act.  *See* ECF No. 25-4 at 2; Minn. Stat. § 181.941 (2023).  Ms. Madigan believed she was being deprived of her "[t]welve weeks paid maternity leave policy at Graco."  Madigan Tr. 177:18–178:8.

*Ms. Madigan was concerned about returning to work, and her leave was extended for medical reasons.*  Three issues caused her concern: First, she would be required to work on unfamiliar machines; second, she would have to work a different shift, from 2:00 p.m. to 2:00 a.m.; and third, she would be exposed to certain chemicals that could adversely affect breastfeeding.  *Id.* 175:18–176:24, 178:23–179:7, 181:10–183:23.  On November 21, her doctor provided Graco a note recommending that Ms. Madigan return to work on December 18 and asking that she be allowed breaks every two to three hours to express milk.  ECF No. 29-10 at 1.  On December 20, Ms. Madigan's physician sent Graco another, similar note, this time pushing the recommended return date to January 8, 2024.  ECF No. 25-4 at 4.  Graco delayed Ms. Madigan's return date to January 19.  Madigan Tr. 186:11–25, 188:1–5.  In total, her leave after childbirth amounted to two weeks' paid leave and about thirteen weeks of unpaid leave.

*Ms. Madigan resigned.*   On January 19, 2024, Ms. Madigan submitted "formal notice of [her] resignation" to Graco.  ECF No. 25-4 at 6.  The letter stated that she resigned effective immediately "because of medical reasons."   *Id.*   Ms. Madigan later testified that the medical reasons were "postpartum distress," and explained that she resigned because Graco treated her poorly while she was pregnant and after giving birth.  Madigan Tr. 187:4–20.

*Ms. Madigan filed suit.*  She brings five causes of action: violation of the Minnesota Parenting Leave Act ("MPLA"), Compl. [ECF No. 1-1] ¶¶ 21–25 (Count I); violation of the Minnesota pregnancy accommodations statute, *id.* ¶¶ 26–31 (Count II); pregnancy discrimination under the Minnesota Human Rights Act ("MHRA"), *id.* ¶¶ 32–37 (Count III); pregnancy discrimination under Title VII of the Civil Rights Act, *id.* ¶¶ 38–42 (Count IV); and retaliation under the FMLA, *id.* ¶¶ 43–45 (Count V).[3]

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson*, 477 U.S. at 248.  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a

---

[3]     Due to a typographical error, the causes of action are misnumbered—Count II is listed twice. *See* Compl. ¶¶ 26–37.  They are listed here according to their numerical order, not the numbers in the complaint.

verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A

Counts I and V allege violations of the MPLA and FMLA. Compl. ¶¶ 21–25, 43–45; *see Hanson v. Mental Health Res., Inc.*, 948 F. Supp. 2d 1034, 1043 (D. Minn. 2013) ("Courts apply the same analysis to interference and retaliation claims under the MPLA as they do under the FMLA."). The MPLA requires employers to "grant an unpaid leave of absence to an employee who is . . . a female employee for prenatal care, or incapacity due to pregnancy, childbirth, or related health conditions." Minn. Stat. § 181.941, subdiv. 1(a)(2) (2023). The employee determines the length of leave, up to twelve weeks, unless the employer agrees to extend it. Minn. Stat. § 181.941, subdiv. 1(b) (2023). "An employer shall not discharge, discipline, penalize, interfere with, threaten, restrain, coerce, or otherwise retaliate or discriminate against an employee for requesting or obtaining a leave of absence as provided by this section." Minn. Stat. § 181.941, subdiv. 3 (2023).[4]

The FMLA is similar. It reads:

**(a) Interference with rights**

**(1) Exercise of rights**

> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

---

[4] The statute was amended to include this language effective July 1, 2023. *See* 2023 Minn. Laws, ch. 53, art. 11, § 30. Previously, subdivision 3 prohibited only retaliation. *See id.* Since the alleged interference occurred in July 2023 or later, the full range of prohibited actions are on the table. The statute was amended in 2024 without change to the relevant provision. *See* 2024 Minn. Laws, ch. 110, art. 2, § 10.

### (2) Discrimination

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a). "Under the FMLA, eligible employees are entitled to take leave from work for certain family or medical reasons, including a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 864–65 (8th Cir. 2006) (citation modified). The FMLA "provides eligible employees up to twelve work-weeks of unpaid leave in any twelve-month period and prohibits employers from discriminating against employees for exercising their rights under the Act." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (citing 29 U.S.C. §§ 2612, 2615(a)(2)).

Though MPLA and FMLA claims are analyzed the same way, Ms. Madigan presents them as factually incompatible theories of relief. In the MPLA claim, Graco forced her to take leave. Compl. ¶ 24. In the FMLA claim, she chose to take leave, and Graco took adverse action against her on that basis. *Id.* ¶ 45.

1

Start with the MPLA claim. The complaint alleges Graco is liable for "forcing her to take intermittent leave under the FMLA and then claiming she had exhausted all of her statutorily allotted leave, rather than give her the full allotted 12 weeks of protected leave after the birth of her child." Compl. ¶ 24. In her brief, Ms. Madigan adds that Graco's

"July 17, 2023 letter warned her that after September 27, any time off could result in termination."  ECF No. 30 at 12.

There is no genuine dispute that Graco did not violate section 181.941 by placing Ms. Madigan on FMLA leave.  The Eighth Circuit "has not addressed whether placing an employee involuntarily on FMLA leave is a form of interference made actionable by the [FMLA]."  *Walker v. Trinity Marine Prods., Inc.*, 721 F.3d 542, 544 (8th Cir. 2013).  Even if this conduct were actionable—and actionable under the MPLA as well as the FMLA— there are several problems with Ms. Madigan's theory.  Under the federal statute, this kind of claim "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past."  *Id.* (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007)).  Ms. Madigan was never denied FMLA leave (or MPLA leave), so her claim is not ripe.  Even if it were, Graco provided Ms. Madigan twelve weeks of FMLA leave up to childbirth, and "the full allotted 12 weeks of protected leave after the birth of her child" under the MPLA. Compl. ¶ 24; *see* Madigan Tr. 172:20–173:2; ECF No. 25-4 at 2 ("After delivery you will be placed on a personal leave of absence . . . and tracked under the MN Pregnancy and Parenting Leave law.").  In fact, she received more than twelve weeks' leave post-childbirth; she was off work from October 8, 2023 (childbirth) to January 19, 2024 (resignation).  *See* Madigan Tr. 173:7, 172:20–173:2,173:22–174:14, 186:11–25, 188:1–5. Similarly, the July 17 letter did not violate the MPLA.  It identified when Ms. Madigan's FMLA leave would be exhausted, but the threatened termination was for seeking leave beyond that provided by the FMLA and MPLA.  *See* ECF No. 25-3 at 19 ("Any time missed

after your benefit exhaustion date . . . would need to be covered by vacation or personal time to bridge the gap until your actual delivery date.  If you do not have enough time available the resulting time would default to personal time and could result in a termination of your employment.").  The MPLA does not forbid that conduct; it protects employees "for requesting or obtaining a leave of absence as provided by this section," not for requesting leave beyond the statutory twelve weeks.  Minn. Stat. § 181.941, subdiv. 3 (2023).

Though Ms. Madigan raises this allegation as an MPLA claim, it resembles an FMLA entitlement claim.  *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).  FMLA regulations provide that Graco could "transfer the employee to a part-time job with the same hourly rate of pay and benefits, provided the employee is not required to take more leave than is medically necessary."  29 C.F.R. § 825.204(c); *see* 29 C.F.R. § 825.202(b) (allowing intermittent leave when a "medical need can be best accommodated through an intermittent or reduced leave schedule"); *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 965–66 (D. Kan. 2021) ("[A] jury could reasonably conclude that, by forcing plaintiff to take FMLA leave on Tuesdays and Thursdays *regardless of any medical necessity* and then terminating her employment when she was unwilling to agree to that forced leave, defendant unlawfully interfered with plaintiff's FMLA rights." (emphasis added)); *Nance v. Buffalo's Café of Griffin, Inc.*, No. 1:03-CV-2887-WSD, 2005 WL 2148548, at *5 (N.D. Ga. Mar. 30, 2005) (denying summary judgment to employer because "there are genuine issues of material fact

regarding whether Defendant required Plaintiff to take more leave than necessary for her condition").

The parties have not identified a corresponding state regulation, so even though FLMA and MPLA claims are analyzed in the same way, *Hanson*, 948 F. Supp. 2d at 1043, it is less clear the same rules apply to the MPLA. If they do, the outcome does not change. Ms. Madigan has not shown a factual dispute that Graco reduced her hours and forced her to take more leave than was medically necessary. Her doctor required 8-hour shifts. ECF No. 25-3 at 14. Graco scaled back her shifts to 8 hours and no less. Madigan Tr. 121:15–23. While Ms. Madigan argues she should have been given five 8-hour shifts, she "never had a medical letter recommending that [she] work five days a week." *Id.* 120:10–13. Graco will be granted summary judgment on the MPLA claim.

2

Our Eighth Circuit Court of Appeals has recognized three types of FMLA claims. *Pulczinski*, 691 F.3d at 1005. "The first type, arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Id.* "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.* Though in several older cases the Eighth Circuit has described this claim as one for "interference" with FMLA rights, *e.g.*, *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006), it more recently declared that "what we formerly described as 'interference' claims henceforth shall be called 'entitlement' claims." *Bosley v. Cargill Meat Sols. Corp.*, 705 F.3d 777, 780 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005) (noting that, since "*all* prohibited acts under

20

§ 2615(a) appear under the heading '*Interference* with rights,'" the Eighth Circuit has shied

away from that terminology). The second type is for "retaliation." *Pulczinski*, 691 F.3d at

1005. A retaliation claim arises under § 2615(a)(2) and occurs when "an employee opposes

any practice made unlawful under the FMLA—for example, if an employee complains

about an employer's refusal to comply with the statutory mandate to permit FMLA leave."

*Id.* at 1006. Employers are liable for retaliation if "for that reason [they] take adverse action

against the employee who is engaged in the opposition." *Id.* The third type of claim is for

"discrimination," and it

> arises when an employer takes adverse action against an
> employee because the employee exercises rights to which he is
> entitled under the FMLA. In this scenario, the employer does
> not prevent the employee from receiving FMLA benefits.
> Rather, it is alleged that after the employee exercised his
> statutory rights, the employer discriminated against him in the
> terms and conditions of employment. An employee making
> this type of claim must prove that the employer was motivated
> by the employee's exercise of rights under the FMLA. The
> textual basis for such a claim is not well developed in [the
> Eighth Circuit's] cases, but the claim likely arises under the
> rule of § 2615(a)(1) that an employer may not "interfere with,
> restrain, or deny the exercise of or the attempt to exercise"
> rights defined by the FMLA. To distinguish the "entitlement"
> claim under § 2615(a)(1), and the "retaliation" claim under
> § 2615(a)(2), we think it helpful to describe this sort of
> complaint as a "discrimination" claim.

*Id.* (citations omitted); *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs.,*

*Inc.*, 826 F.3d 1149, 1157 n.5 (8th Cir. 2016) (noting an "unresolved difference of opinion"

in the Eighth Circuit as to whether a discrimination claim arises under § 2615(a)(1) or

(a)(2)). Older Eighth Circuit cases called these "retaliation" claims. *See Wierman v.*

*Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011); *Quinn v. St. Louis County*, 653 F.3d 745, 754 (8th Cir. 2011).

Discrimination claims are subject to the *McDonnell Douglas* burden-shifting framework, where to make a prima facie case "an employee must show: (1) that he engaged in an activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Pulczinski*, 691 F.3d at 1007; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[5] If Ms. Madigan establishes her prima facie case, the burden shifts to Graco "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If Graco succeeds at that step, the burden shifts back to Ms. Madigan to show that Graco's proffered reason is pretextual. *See Wierman*, 638 F.3d at 993.

---

[5]    The Eighth Circuit has not ruled whether the "materially adverse" standard for FMLA discrimination claims remains after *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). *Muldrow* held that, to establish a prima facie Title VII discrimination claim, a plaintiff must show that she suffered an injury, but not that the injury was "material" or "significant." 601 U.S. at 352–53. The "materially adverse" standard still applies to Title VII retaliation claims. *Id.* at 357–58. Courts have applied *Muldrow* to other discrimination statutes, but case law on FMLA claims is scant. *See, e.g.*, *Plump v. Gov't Emps. Ins. Co.*, 161 F.4th 1222, 1229 n.10 (10th Cir. Dec. 16, 2025) (declining to reach the proper standard for a FMLA retaliation claim post-*Muldrow*). Because FMLA discrimination claims function like Title VII retaliation claims, the better answer is that *Muldrow* doesn't change the analysis. *Compare Parker v. U.S. Dep't of Agric.*, 129 F.4th 1104, 1114 (8th Cir. 2025) (laying out Title VII retaliation elements at prima facie stage), *with Pulczinski*, 691 F.3d at 1007 (laying out same elements for prima facie FLMA discrimination claim). However, nothing rides on this distinction; Ms. Madigan's claim would fail under the more lenient standard as well.

There is some confusion over how to understand Ms. Madigan's FMLA claim. First, the complaint alleges Graco retaliated against her, but the brief adds that Graco is also liable for interference—an ambiguous term, as *Pulczinski* recognized.  ECF No. 30 at 14–15; *Pulczinski*, 691 F.3d at 1005.  Second, Ms. Madigan cites a case that uses the old terminology, ECF No. 30 at 14 (citing *Estrada v. Cypress Semiconductor (Minn.), Inc.*, 616 F.3d 866, 871 (8th Cir. 2010)), and that case describes "interference" claims the same way *Pulczinski* describes "discrimination" claims.  *Compare Estrada*, 616 F.3d at 871 ("[An interference claim] occurs when an employer's action deters or attaches negative consequences to an employee's exercise of FMLA rights."), *with Pulczinski*, 691 F.3d at 1006 ("[A discrimination claim] arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA."). Third, Ms. Madigan does not explain whether this cause of action is brought in the alternative.  In Counts I and III, she alleges that Graco forced her to take FMLA leave, Compl. ¶¶ 24, 36, yet she claims she told the company "she would exercise her rights under the FMLA," *id.* ¶ 45.  It is difficult to square these allegations.

Setting aside those problems, there is no FMLA theory on which Ms. Madigan's claim survives summary judgment.  I do not understand Ms. Madigan to raise an entitlement claim because her brief's reference to "interference" reads like a discrimination claim, and she does not allege that Graco deprived her of her rights under the FMLA.  ECF No. 30 at 14–15.  To the extent an FMLA entitlement claim piggybacks on the MPLA claim, it would fail for the reasons explained above.  If Ms. Madigan intended to argue a retaliation theory, she has not shown that she opposed any Graco practice that the FMLA

forbids.  *See Pulczinski*, 691 F.3d at 1006.  To take *Pulczinski*'s example, she has not "complain[ed] about [Graco's] refusal to comply with the statutory mandate to permit FMLA leave," *id.*, and the undisputed record shows that Graco complied with FMLA's requirement of providing twelve weeks of leave.  *See* ECF No. 25-3 at 19 (granting FMLA leave); ECF No. 25-4 at 2 (noting FMLA leave exhaustion).

On the discrimination theory, she identifies five adverse actions, but none creates a triable issue of fact.  Graco "[1] refused [to provide] a modified 40-hour per week schedule," "[2] misclassified [her] accommodations as FMLA, [3] threatened termination, . . . [4] denied her 12 weeks of leave after childbirth," and "[5] artificially accelerated exhaustion of [her] leave entitlement."  Compl. ¶ 44; ECF No. 30 at 14–15.  As explained with respect to the MPLA claim, Graco was not required to provide a modified 40-hour workweek, and there is no factual dispute that the company's intermittent leave complied with FMLA regulations.  The threatened termination was for taking leave beyond that provided by statute.  *See* ECF No. 25-3 at 19.  These are not adverse actions, let alone materially adverse.  *See Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) (defining "materially adverse" as causing "significant harm").  Additionally, several purported retaliatory actions lack support in the record.  Graco did not deny her twelve weeks of leave after childbirth; it provided two weeks paid leave and thirteen weeks unpaid leave.  The artificial acceleration she refers to is Graco's short-term disability leave.  *See* ECF No. 29-5 at 1 ("Per Graco policy, partial hours of disability are deducted the same as a full shift.  To that end, your [short-term disability] would be deducted by 36 hours per week (even though you are only missing 12 hours of work) . . . .").  FMLA regulations require employers to

24

account for "intermittent or reduced leave . . . using an increment no greater than the shortest period of time" used for other forms of leave, 29 C.F.R. § 825.205(a)(1), and there is no dispute that Graco deducted Ms. Madigan's FMLA leave and short-term disability leave in hour-long increments, so Graco did not run afoul of the regulation. Even if she had shown an adverse action, Ms. Madigan points to nothing in the record establishing a causal connection between her exercise of FMLA leave and Graco's action. Graco will be granted summary judgment on Count V.

B

Under Minnesota's pregnancy accommodations statute,

> [a]n employer must provide reasonable accommodations to an employee for health conditions related to pregnancy or childbirth upon request, with the advice of a licensed health care provider . . . unless the employer demonstrates that the accommodation would impose an undue hardship on the operation of the employer's business. . . . Reasonable accommodation may include but is not limited to temporary transfer to a less strenuous or hazardous position, temporary leave of absence, modification in work schedule or job assignments, seating, more frequent or longer break periods, and limits to heavy lifting. Notwithstanding any other provision of this subdivision, an employer shall not be required to create a new or additional position in order to accommodate an employee pursuant to this subdivision and shall not be required to discharge an employee, transfer another employee with greater seniority, or promote an employee.

Minn. Stat. § 181.939, subdiv. 2(a) (2023).[6] Further, "[a]n employer shall not require an employee to take a leave or accept an accommodation." Minn. Stat. § 181.93, subdiv. 2(c)

---

[6] This version of the statute became effective July 1, 2023. 2023 Minn. Laws ch. 53, art. 11, § 27. The previous version was substantively similar. *See* Minn. Stat. § 181.939, subdiv. 2(a) (2021) ("'Reasonable accommodation' may include but is not limited to

(2023). Graco cites extensive case law about reasonable accommodations in the Americans with Disabilities Act context, *see* ECF No. 24 at 16–20, though it cites no case applying that law to the Minnesota pregnancy accommodations statute, and independent research has identified none.

No reasonable jury could find that Graco violated Ms. Madigan's rights under the statute's plain text. The parties agree that Ms. Madigan could not continue work as a machinist with her medical restrictions. The job required her to lift heavy objects and be exposed to lead and loud noises. Madigan Tr. 61:19–62:10. Graco and Ms. Madigan "engage[d] in an interactive process" over the accommodation request, as the statue requires. Minn. Stat. § 181.939, subdiv. 2(a) (2023). Ms. Madigan envisioned temporarily working in a new position. *See* Madigan Tr. 61:1–11 ("Graco is a large company with lots of different jobs that people do. And I knew that they would be able to find something that I could do that would not require lifting over 15 pounds or hearing protection or being exposed to chemicals in any way."). That's in line with the statute's description of reasonable accommodation. Minn. Stat. § 181.939, subdiv. 2(a) (2023). Graco did just that—it provided her temporary work that accommodated her restrictions, first in Anoka and then in Minneapolis.[7] *See* Madigan Tr. 83:18–85:22, 125:25–126:9, 127:2–9.

---

temporary transfer to a less strenuous or hazardous position, seating, frequent restroom breaks, and limits to heavy lifting."). The statute was amended again in 2024 without change to the relevant provision. *See* 2024 Minn. Laws ch. 110, art. 2, § 9.

[7]    Ms. Madigan testified that she may have been exposed to unsafe chemicals while working in the Minneapolis office, *see* Madigan Tr. 123:2–125:25. The record does not show that she was exposed to lead or other dangerous substances, however, and Ms. Madigan does not argue in her brief that this potential exposure constituted failure to provide a reasonable accommodation. The same goes for the brief moments when she was

Ms. Madigan argues that Graco violated the statute in three ways. First, she proposed a reasonable accommodation of a five-day, 8-hour-per-day, workweek reprogramming meters, but Graco only allowed her to work three 8-hour days per week. Compl. ¶¶ 27–28. Second, Graco "forc[ed] her to use her FLMA to account for the remaining 16 hours in the work week." ECF No. 30 at 12. And third, Graco treated Ms. Madigan's medical restrictions as optional requests, not requirements. *Id.* at 13.

These are not trial-worthy theories. The first two contentions fail because the statute did not require Graco to create additional work or grant leave without counting it against FMLA leave. Ms. Madigan suggests Graco should have given her full-time work in another role. The statute expressly denies that an employer must "create a new or additional position in order to accommodate" a pregnant employee. Minn. Stat. § 181.939, subdiv. 2(a) (2023). And while reasonable accommodation "may include . . . [a] temporary leave of absence," the statute did not require Graco to do so without counting it against FMLA leave. Minn. Stat. § 181.939, subdiv. 2(a) (2023). The statute expressly provides that "[n]othing in this subdivision shall be construed to affect any other provision of law relating to sex discrimination or pregnancy or in any way diminish the coverage of pregnancy, childbirth, or health conditions related to pregnancy or childbirth under any other provisions of any other law." Minn. Stat. § 181.939, subdiv. 2(b). Ms. Madigan identifies no case that might call these conclusions into question. And her third argument fails because Graco provided reasonable accommodations; it merely asked Ms. Madigan

---

tasked with lifting heavy boxes. These problems were resolved without requiring her to exceed the lifting restriction, and she does not argue otherwise.

to submit doctor's notes mandating rather than requesting a restriction. *See* ECF No. 29-5 at 1 ("[T]he document provided is interpreted as a request from your health care provider to reduce your shifts to eight hours per shift, not a mandate. It reads 'Please allow . . .'' This is far different from a document which dictates what an employee can and cannot do."). There is no dispute that Graco allowed Ms. Madigan to work 8-hour shifts. *See* Madigan Tr. 119:6–11, 121:15–23. Graco will be granted summary judgment as to Count II.

C

Counts III and IV raise parallel state and federal pregnancy discrimination claims.[8] *See* Compl. ¶¶ 32–42. Under the MHRA, an employer may not "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" "because of . . . sex." Minn. Stat. § 363A.08, subdiv. 2(3). "Sex" includes "pregnancy, childbirth, and disabilities related to pregnancy or childbirth." Minn. Stat. § 363A.03, subdiv. 42. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "The terms 'because of sex' or 'on the basis of sex' include . . . because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical

---

[8]    The complaint cites the MHRA's retaliation provision, but based on the text of the complaint and the argument in the opposition brief, I understand Ms. Madigan to raise a discrimination claim. *See* Compl. ¶¶ 37, 42 (citing Minn. Stat. § 363A.15); *id.* ¶¶ 33–36, 41 (alleging discrimination).

conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k). To prevail on a Title VII discrimination claim, the plaintiff must show that the employer treated her "worse" because of a protected trait, but she does not have to show that the harm was significant. *See Muldrow*, 601 U.S. at 354–55; *cf. Villaume v. iTradeNetwork, Inc.*, No. 24-cv-2005 (ECT/DLM), 2025 WL 33697, at *4 n.4 (D. Minn. Jan. 6, 2025) ("In the relatively brief post-*Muldrow* period, district courts in the Eighth Circuit have applied *Muldrow* to MHRA disability-discrimination claims."). The state and federal statutes share "substantial similarities," so courts often treat them together. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn. 1983); *see Sigurdson v. Isanti County*, 386 N.W.2d 715, 719 (Minn. 1986) ("In analyzing cases brought under the [MHRA], we have often applied principles developed in the adjudication of claims arising under Title VII of the Civil Rights Act of 1964."); *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997).

Ms. Madigan does not claim to have "direct evidence of discrimination," meaning her claims are evaluated under *McDonnell Douglas*'s burden-shifting framework. *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) (discussing Title VII); *Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1114 (8th Cir. 2023) (discussing MHRA). Under *McDonnell Douglas*, Ms. Madigan must first establish a prima facie case by showing that (1) she is a member of a protected group; (2) she is qualified for her former position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See Elam*, 601 F.3d at 879; *Schulte Hosp. Grp.*, 66 F.4th at 1114. Graco does not dispute the first two elements. For purposes of summary judgment.

they concede Ms. Madigan is a member of a protected group and that she was qualified as a machinist. *See* ECF No. 24 at 21–30. These claims thus hinge on the last two elements of the prima facie case: adverse employment action and inference of discrimination.

"One way a plaintiff can establish an inference of discrimination is to prove that she was treated less favorably than similarly-situated employees who were not in her protected class." *Wierman*, 638 F.3d at 993–94. "Similarly-situated" means similar "in all relevant aspects"—the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). Evidence that comparators were treated differently must be "specific" and "tangible." *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005) (quoting *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 n.4 (8th Cir. 1998)).

On this record, these MHRA or Title VII claims are not trial-worthy. Ms. Madigan's brief identifies two adverse actions: she "was denied full-time hours and forced into leave," and she was denied the "twelve weeks of *paid* time off" as provided by Graco policy.[9]

---

[9]    Ms. Madigan waived her right to argue any other Graco action was adverse under these statutes, including a constructive-discharge claim. *See Hassan v. Amazon.com Servs., LLC*, No. 23-cv-1470 (ECT/DLM), 2025 WL 591313, at *7 (D. Minn. Feb. 24, 2025) (collecting waiver cases). If she hadn't waived the argument, she could not show that she was constructively terminated. She resigned on January 19, 2024. ECF No. 25-4 at 6. She filed her discrimination charge with the EEOC on August 4, 2023. ECF No. 25-3 at 22. She did not indicate in her charge that her discrimination was a continuing action. *Id.* She has not exhausted her administrative remedies with respect to this claim, as the circumstances of her termination—what she claimed were "medical reasons," ECF No. 25-4 at 6—are not "like or reasonably related" to the allegations in the EEOC charge. *Wedow v. City of Kansas City*, 442 F.3d 661, 672 (8th Cir. 2006); *see* ECF No. 25-3 at 22 ("[Graco] forced me to work at a different location (over 30 minutes away) and cut my

ECF No. 30 at 13–14. Her "forced leave" argument is a reworking of her other claims: Graco allowed her to work three 8-hour shifts, did not provide extra hours of work, and docked her 12 hours of FMLA leave each week. She requested a daily 8-hour work restriction, and Graco accommodated that. Madigan Tr. 119:6–11, 121:15–23. She was willing to work two more shifts per week, but Graco did not offer her those shifts and instead informed her this arrangement would use up twelve hours of FMLA leave per week. *Id.* 119:6–24. As with the FMLA claim, Graco's conduct does not amount to adverse employment action. The argument based on Graco's pregnancy-leave policy fails as well. Ms. Madigan produced a document showing that Graco had a policy to provide twelve weeks of paid pregnancy-related medical leave. ECF No. 29-8 at 1. Graco's evidence that it provided only two weeks of paid leave cannot be credited in this procedural posture. *See* ECF No. 25-1 at 2; Fed. R. Civ. P. 56(a). Assuming Graco's failure to pay is an adverse action, Ms. Madigan has not shown any comparators were treated better. While her brief asserts that she was "treated differently" from other pregnant employees who did not use FMLA leave, ECF No. 30 at 14, that is not the relevant protected category for her MHRA and Title VII claims, which tether discrimination to pregnancy. She identifies no comparators who received full pay during pregnancy-related leave, and admitted that she "was not totally sure what happens with other women at Graco when they take their maternity leaves." Madigan Tr. 135:6–13; *see* ECF No. 30 at 14 ("Graco had a policy

---

hours to allow me to receive the accommodations I needed. . . . [Graco] has also been trying to force me to sign documents that affect my leave.").

allowing up to twelve weeks of *paid* time off following pregnancy. Madigan was treated differently because she was not provided this benefit.").

If she could show an adverse action, she has not shown an inference of discrimination. Lacking comparators, she argues that "she was [Graco's] only pregnant machinist in 17 years," so a jury could infer that she was subject to disparate treatment. ECF No. 30 at 13. Accepting that fact makes no difference for comparator analysis, which requires plaintiffs to identify "similarly situated employees, who are not members of the protected group," who were "treated differently." *Clark*, 218 F.3d at 918. The non-pregnant employees she identifies are not similarly situated. The machinist with a lifting restriction continued to work five 8-hour shifts, just at different times. Madigan Tr. 206:2–207:8. The machinist with the chemical restriction was assigned to use cutting fluid instead of cutting oil. *Id.* 63:10–64:18. No comparators had a noise restriction. *Id.* 65:23–25. There is no evidence that they shared a supervisor with Ms. Madigan, and no one else had an hours restriction or requested additional shifts. On this record, she has not met her burden to show that the machinists are similarly-situated comparators. Because Ms. Madigan has not made her prima facie case of discrimination under the MHRA or Title VII, Graco will be granted summary judgment on Counts III and IV.

III

There is one more matter to address: Ms. Madigan's brief cites two nonexistent cases. First is the fictitious "*Hernandez v. Best Buy Co.*, 2012 WL 1970771 (D. Minn. May 31, 2012)." ECF No. 30 at 12. There is a case at that citation, but it's an insurance contract dispute in the Sixth Circuit, and it has nothing to do with the MPLA, which it was cited to

support.  *See Detroit Pub. Schs. Program Mgmt. Team v. Valley Forge Ins. Co.*, No. 11-1549, 2012 WL 1970771 (6th Cir. 2012).    The second is "*LaPoint v. Family Orthodontics, P.A.*, 2020 WL 6118773 (D. Minn. Oct. 16, 2020)."  ECF No. 30 at 12.  There is a case at that citation, filed on that date—an action brought by the Securities and Exchange Commission over allegedly fraudulent liquor license loans.  *See SEC v. Champion-Cain*, No. 3:19-cv-1628-LAB-AHG, 2020 WL 6118773, at *1 (S.D. Cal. Oct. 16, 2020).  The *SEC* case has nothing to do with the relevant subject: Minnesota's pregnancy accommodations statute.  It's worth noting there is a Minnesota Supreme Court case with the cited caption, and it discusses pregnancy discrimination under the MHRA.  *See LaPoint v. Fam. Orthodontics, P.A.*, 892 N.W.2d 506, 513–18 (Minn. 2017).  It does not support, however, the contention in Ms. Madigan's brief that "[m]anagement testimony shows HR treated her doctor's note as optional."  ECF No. 30 at 12 (citing the fictitious *LaPoint*).

After Graco pointed out it could not locate *Hernandez* or *LaPoint*, ECF No. 32 at 1, Ms. Madigan's counsel emailed chambers and opposing counsel, acknowledging that he used an artificial-intelligence-based legal-research service to aid his briefing.  He stopped short of admitting that *Hernandez* and *LaPoint* were AI hallucinations, acknowledging only that they were "incorrect."[10]  Subsequently, in a second letter sent to the Court and Graco's counsel, Ms. Madigan's counsel expressed his view "that the two citations related to small

---

[10]    Ms. Madigan's counsel did not appear for the scheduled summary-judgment hearing.  Around the time the hearing was to begin, the Court telephoned counsel.  He apologized for his absence, explaining he had calendared the hearing incorrectly.  The hearing was canceled, and the motion decided on the papers.

background points and do not relate to the substantive analysis of the summary judgment issues."

When an attorney presents the court with a signed brief, he "certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). A reasonable inquiry requires that "the prefiling investigation must uncover a factual basis for the plaintiff's allegations, as well as a legal basis." *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003). "Every filing in a federal court that contains citations to phony case law amounts to a violation of Rule 11(b) of the Federal Rules of Civil Procedure." *Turnage v. Associated Bank, N.A.*, No. 25-cv-3004 (ECT/DTS), 2025 WL 3052638, at *3 (D. Minn. Sep. 12, 2025). Courts "may consider the wrongdoer's history, experience and ability, the severity of the violation, the degree to which malice or bad faith contributed to the violation, and other factors." *Pope v. Fed. Express Corp.*, 49 F.3d 1327, 1328 (8th Cir. 1995) (citing *White v. Gen. Motors Corp.*, 908 F.2d 675, 685 (10th Cir. 1990)). "On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). Here, I conclude the better approach is to leave the issue where it is. The problematic conduct has been raised with counsel. Though

counsel's responses do not reflect clear or complete acceptance of responsibility,[11] I believe counsel understands the problem and will take steps to prevent the same thing from recurring in future cases.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendant Graco Inc.'s Motion for Summary Judgment [ECF No. 22] is **GRANTED**.

2.      Plaintiff Sophia Madigan's Complaint [ECF No. 1-1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 4, 2026                    s/ Eric C. Tostrud
                                           Eric C. Tostrud
                                           United States District Court

---

[11]      For example, counsel's claim that the fake cases were minimally relevant is not reasonable.  They are the only two cases counsel cited to oppose summary judgment on Ms. Madigan's MPLA and pregnancy accommodations claims.  ECF No. 30 at 11–13.